UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT MAXFIELD,<br><br>          Plaintiff,<br><br>v.<br><br>BRIGHAM YOUNG UNIVERSITY -<br>IDAHO,<br><br>          Defendant. | Case No. 4:12-cv-00443-CWD<br><br>**MEMORANDUM DECISION AND<br>ORDER** |

## INTRODUCTION

Robert Maxfield brings this action against his employer, Brigham Young

University – Idaho (the University), alleging he was discharged and not rehired in

violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.

§ 621 *et. seq*., and as a result, he was unlawfully denied his pension benefits under the

Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et. seq*.

Maxfield alleges also a state law claim for age discrimination under the Idaho Human

Rights Act, Idaho Code § 67-5901 *et. seq*. The University filed its motion for summary

judgment on September 23, 2013, and the Court conducted a hearing on April 21, 2014.

After carefully considering the parties' arguments and the record before it, the

Court issues this Memorandum Decision and Order granting in part and denying in part

the University's motion.

## FACTS[1]

Maxfield graduated from Brigham Young University in 1984, and began his post-

graduate career at BYU as a career counselor that same year. In 1988, Maxfield accepted

a position at Ricks College in Rexburg, Idaho, as the placement center director in the

Career Services Office. In 2000, Ricks College changed from a two-year junior college to

a four-year university, and became known as Brigham Young University – Idaho (the

University). Maxfield remained the career placement director, but his job duties increased

as he took on more responsibility for career placement, internships, and teacher

placement. The University hired Guy Hollingsworth in 2000 or 2002 to direct the

internship program. During this period, Maxfield and Hollingsworth worked together out

of the same office. Maxfield describes his working relationship with Hollingsworth as

"decent." Maxfield Depo. at 46 (Dkt. 27 at 10). The two worked in the same office

together until 2006.

In February of 2006, the University merged the student employment and career

services office to form the Internship and Career Services Office. Guy Hollingsworth

became the director of this new office, which served all University students. In April of

2006, the University placed Maxfield in a different office—the Field Services Office in

---

[1] The Court finds the following facts material and undisputed or, when disputed, taken in the light most favorable to Maxfield, the Plaintiff and non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the non-moving party on motion for summary judgment).

the Department of Education. As Director of Teacher Career Services, Maxfield was responsible for student-teacher placement, career counseling for education majors, and coordination of career fairs for the University's education majors. In August of 2009, Dean Cloward became head of the Field Services Office and Maxfield's supervisor.

In early 2011, the University decided to combine its Internship and Career Services offices with its Academic Counseling office, creating the Academic Discovery Center, or ADC. The intent was to combine academic advising, internship, and career services, and thereby streamline the services provided to University students. The organizing committee[2] recognized there was a duplication of effort between the ADC and the Teacher Education Department, where Maxfield worked. Both offices were helping students with career placement, but the ADC provided service to all University students, while the Teacher Education Department limited its career counseling services to teacher education students.

In February of 2011, Dean Cloward informed Maxfield of the reorganization, and asked Maxfield whether it made more sense for Maxfield's position to remain in the Department of Education or to move to the ADC. Maxfield indicated he would prefer to remain in the Field Services Office to serve education students better, but that he would go wherever he was needed. Maxfield understood from Dean Cloward that the University would have career counseling positions within the ADC, and he could either stay in the Field Services Office, or work in the ADC. Maxfield Depo. at 123 (Dkt. 27 at 18).

---

[2] The committee consisted of Beth Baldwin, Dean Cloward, Guy Hollingsworth, Amy LaBaugh, Debbie McPheters, Carla Ricks, Kevin Stanger, Sean Tippetts, Larry Thurgood and Debbie Willis.

On May 5, 2011, the University decided to consolidate the Teacher Education Department's Teacher Career Services Office with the ADC. As part of the reorganization, Maxfield's job duties would be moved to the ADC and redistributed, but Maxfield would not move to the ADC and he would no longer have a position. On June 6, 2011, Maxfield met with Dean Cloward, Larry Thurgood, Kevin Stanger, and Beth Baldwin. Maxfield was informed that his employment was being terminated, and that there was no longer a position available for him in the Teacher Education Department, but he was free to apply for any open position at the University. Maxfield was not provided notice of his termination prior to the June 6, 2011 meeting. Anderson Depo. at 65 (Dkt. 36-7at 8). Maxfield asked if his job performance had been a factor in the decision to terminate his employment, and he was told he had done nothing wrong. Dean Cloward and Larry Thurgood provided Maxfield with positive letters of recommendation. There is no evidence in the record of any negative or adverse performance reviews of Maxfield's performance

Maxfield had enough paid leave to continue to receive a paycheck through August 31, 2011, and the University treated Maxfield as an unpaid employee through December 31, 2011, to allow him to accrue continued Deseret Mutual Retirement Association ("DMBA") benefits. Broadhead Depo. Ex. 60 (Dkt. 36-5). Maxfield was informed, however, that June 10, 2011, would be his last day of work, meaning he had to pack up his office, wrap up ongoing projects, and train individuals[3] taking over his job

---

[3] It is not clear from the record who Maxfield was asked to train. As explained later, Maxfield's job duties were parceled out among employees working in the newly formed ADC, while Dean Cloward and his assistant handled the placement of student teachers from within the Teacher Education Department.

responsibilities. At the time his employment was terminated, Maxfield was 54 years of age, he had been working at the University for 27 years in a career development and advising capacity, and he earned a salary of $70,440.

Unlike in 2006 when the University reassigned Maxfield from the Internship and Career Services Office to the Teacher Education Department, the University decided not to reassign Maxfield to the ADC. The University set forth several reasons, as follows: (1) Guy Hollingsworth, who was now working in the ADC, did not want to be "forced to take" Maxfield, although the ADC would consider Maxfield if he applied for specific openings; (2) in Baldwin's opinion, it can be difficult to force a transfer and require the recipient of the transfer to create a new job opening for the transferee; (3) Maxfield expected to maintain his same salary and rank, even though he knew all the positions into which other people were transferred were of lower rank;[4] and (4) Maxfield had expressed his preference to remain in the Field Service Office of the Teacher Education Department. The University was aware that its reorganization "affected a long-term employee nearing a qualifying age for retirement." Baldwin Depo. Ex. 84 (Dkt. 36-4 at

---

[4] To support this assertion, the University cited to page 184 of Maxfield's deposition. During his deposition, Maxfield was asked the following:

Q. Was the career advising slots that were---you say people were rolled into really of the same rank as the position that you had in the Field Services Office?
A. No, they were not.
Q. Were they lower rank?
A. Yes.
Q. Okay. Did you expect that you would be rolled over into the Academic Discovery Center at the same rank that you held?
A. I wasn't sure.
Q. Was that your anticipation or your hope?
A. Yes. Yeah. I had quite a bit more experience than any of those that were rolled over or the new ones that were hired.
Maxfield Depo. at 184 (Dkt. 27 at 29).

**MEMORANDUM DECISION AND ORDER - 5**

16). There is no dispute that Maxfield was the only employee affected by the reorganization who was not provided a position within the ADC.

Maxfield testified he worked twenty-six years for the University and attained recognition for his work beyond the University. Maxfield Depo. at 159-163 (Dkt. 27). After the reorganization, numerous employees within the ADC called Maxfield to ask for assistance with their jobs. *Id.* Although Maxfield would have liked to have returned to the University at his original salary, he "would have taken less, but no one asked [him] anything like that." *Id.* He applied for alternative positions in the University, and would have been fine with going "anywhere [he] could fit." *Id.* Maxfield was not hired for any of the positions for which he applied.

At the time of Maxfield's termination from employment on June 6, 2011, four Career and Academic Counseling positions, which were considered new positions, were open in the ADC. Baldwin Depo. at 118 (Dkt. 36-4 at 8). The University was accepting applications for those positions through June 12, 2011. *Id.* at 146 (Dkt. 36-4 at 9). Maxfield, however, did not apply for those positions. Maxfield states Baldwin informed him of the open positions, but that he did not apply because he was asked to finish packing his office and complete his work by June 10, 2011. Baldwin believed Maxfield was qualified for the four open positions. The University admitted also that Maxfield was suitably qualified for several other positions open in May and August of 2011, which positions included Support Services Coordinator, Tutoring Services Coordinator, Student

Honor Coordinator, First Year Experience Coordinator, Student Support Coordinator, and Admissions Coordinator. Baldwin Depo. at 153-56, and Ex. 44 (Dkt. 36-4 at 18).[5]

The four academic counseling positions in the ADC were filled with three individuals as follows: Tyler Christensen (age 34); Vance King (age 29) and Natalie Whittaker (age 31). All three were hired at lower salaries than Maxfield. Casperson Aff. Ex. 10 (Dkt. 36-10). In November, Mindy Harris (age 33), an administrative assistant, was promoted to the fourth open academic counseling position at a salary of $45,900 per year. Casperson Aff. Ex. 9 and 10 (Dkt. 36-8, 36-9, 36-10).

Within the newly organized ADC, Maxfield's prior career counseling and teacher placement duties were distributed among employees Debbie Willis (age 49), Carrie Valora (age 34), and Vance King (age 29), who were working in the ADC. Baldwin Depo. at 182 (Dkt. 36-4 at 13); Ex. 53 (Dkt. 36-4 at 24). Employees who previously worked in different departments and whose job responsibilities were assumed by the ADC continued in their employment within the ADC, and were not required to interview or apply for their positions. Baldwin Depo. at 167-169; Ex. 53 (Dkt. 36-4 at 11-12; 24). Baldwin described the process as continuing the individual's employment by retaining their existing job responsibilities, and adding additional responsibilities required by the reorganization. Baldwin Depo. at 167 (Dkt. 36-4 at 11). Rebecca Chidester (age 31) and Stephanie Donahoo (age 32), both of whom previously worked in the Online Learning

---

[5] It is not clear from the exhibit attached to Baldwin's deposition which department or office these positions were in. Only the position title is given.

Department, are two examples of employees who retained their job responsibilities and began working in the ADC without having to apply or interview. *Id.* at 168.

In July of 2011, the ADC experienced job turnover. Maxfield applied for two open positions, one for academic coordinator/team lead and the second for academic counselor. Baldwin Depo. at 118 (Dkt. 36-4 at 8). Maxfield, along with three other individuals,[6] were interviewed for the two positions. According to an email dated August 3, 2011, and written by Baldwin to Fenton Broadhead, all four interview candidates "did well in the interview process and presented suitable qualifications," but the University hired Michael Cornick (age 35) and Chris Humphreys (age 35) at salaries of approximately $50,000. Ex. 230 (Dkt. 36-18 at 13); Aff. of Casperson Ex. 9, 10 (Dkt. 36-11 at 1-36-12 at 20). Baldwin claims Maxfield was not hired because he made "disqualifying statements" about how he struggled with tedious detailed work, and both positions required highly detailed work. Baldwin Depo. at 200 (Dkt. 24 at 20-21). Maxfield denies making any disqualifying statements during his interview, explaining he stated instead that every job has certain tasks that are more difficult to force yourself to do, and that when faced with such tasks, he would "just have to buckle down and get it done." Aff. of Maxfield at ¶¶ 4-5 (Dkt. 36-20 at 2).

In August of 2011, Maxfield applied for a position in the admissions office, but did not receive an interview. Maxfield Depo. at 203 (Dkt. 27-1 at 3). Maxfield was informed of an open position for Student Support Coordinator, but he did not finalize his

---

[6] It is not clear in the record whether the other three individuals had previously been employed by the University or not. Only a portion of the testimony regarding that line of questioning is in the record. Baldwin was asked first about Michael Cornick, and Baldwin answered that she did not know whether he worked for the University previously. The page following this line of questioning is not consecutive. *See* Baldwin Depo. at 120 (Dkt. 36-4 at 8).

application because, after a conversation with Baldwin, he determined that his skills were not in line with the position's requirements. Maxfield Depo. at 203 (Dkt. 27-1 at 3). Baldwin informed Maxfield of two open positions in the financial aid and scholarship office, but Maxfield did not apply for those positions. *Id.* at 218-219 (Dkt. 27-1 at 5). Maxfield continued to teach at the University as an adjunct instructor through December of 2012, leaving that position voluntarily because, if he did not, he would not be eligible for supplemental retirement benefits. A full-time faculty position was not an option because Maxfield lacked a master's degree.

At the time of Maxfield's discharge in June of 2011, the University retained a full time equivalent position in the Field Services Office of the Teacher Education Department, where Maxfield had worked, but the University decided to revamp the job description and qualifications required. Thurgood Depo. at 35-36 (Dkt. 36-3). Until that occurred, Dean Cloward handled the placement of student teachers in his capacity as Director of the Field Services Office, with the assistance of his office assistant. Baldwin Depo. at 32-34 (Dkt. 36-4). The University contends that the remaining portions of Maxfield's prior job duties that remained within the Field Services Office did not comprise a full-time position. Baldwin Depo. at 33. (Dkt. 36-4).

Eventually, some months later, the requirements of the full-time equivalent position in the Field Services Office were assessed. A new job description was written to include the duties Maxfield had performed (and which had not been assumed by the ADC) as well as other responsibilities and tasks, and the University advertised the position. *Id.* The position required applicants to possess a master's degree, which

Maxfield did not have. (Dkt. 21 at 5-6). But, according to Thurgood, who was Dean of the Department of Education during 2011, Maxfield was capable of performing all of the job duties of the advertised position. Thurgood Depo. at 72-79 (Dkt. 36-3). The University hired Karla LaOrange in the spring of 2012 to fill the position in the Field Services Office. Karla LaOrange was fifty-one years of age at the time of hire, and she possessed a master's degree and the requisite experience advertised in the job description.

In 2013, the University hired five new employees to work in the ADC. The three full-time hires were all under 30 years of age. Two other individuals hired in 2013 were over forty years of age, but were hired for part-time positions with no benefits. Of the twelve total new hires in the ADC from 2011 - 2013, all were under forty years of age except for the two part-time employees. Pl. Stmt. Of Facts ¶ 25 (Dkt. 36-1) (citing Casperson Aff. Ex. 9, 10; Anderson Depo., Ex. 70).[7]

The University's Employment Policies contain a provision regarding transfer, promotion and demotion of employees. Baldwin Depo. at 184, Ex. 54 (Dkt. 36-4 at 26). The Policy provides as follows:

> BYU-Idaho will strive to promote from within to fill a vacant position and attempt to accommodate employee's needs for different positions by allowing employees to transfer. Promotions, transfers and demotions need to be closely coordinated with Human Resources.
> 1. <u>Transfers</u>
> a. BYU-Idaho will give preference to current employees desiring to transfer as long as they are suitably qualified for the position.
> b. Employees who desire to transfer must notify their current supervisors of their desire to transfer before they may be considered for a transfer….

---

[7] Maxfield explains that these twelve employees are individuals who did not move to the ADC from other positions at the University, but were new hires.

During his employment, Maxfield received monetary contributions to his retirement funds from the University. There were two types of retirement funds---a thrift plan which employees could contribute to, and which DMBA would match up to 4%---and a master retirement fund, which employees could not contribute to. Anderson Depo. at 68-69, (Dkt. 36-7 at 8-9). Prior to Maxfield's termination from employment, the contribution levels to the master retirement fund dropped, but if an employee elected to do so, he or she could receive a match up to 6% to their thrift plan contributions. *Id.* This change affected new hires only. When the University terminated Maxfield's employment, he was no longer entitled to the retirement benefit contributions he had been receiving as an employee of the University. However, Maxfield did not lose any benefits already vested at the time of his termination from employment.

## ANALYSIS

**1.      Evidentiary Objection**

Before turning to the heart of the analysis, Maxfield raised an evidentiary objection in the form of a motion to strike the supplemental affidavit of Beth Baldwin, submitted with the University's reply. At the outset, the Court notes that Fed. R. Civ. P. 56 does not endorse motions to strike. Cmt., 2010 Amendments. Rather, subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact "cannot be presented in a form admissible in evidence." The objection is akin to an objection made at trial, and there is no need to file a separate motion to strike. The Court therefore denied the motion to strike, and permitted Maxfield to file a sur-reply. But instead of setting forth objections within the sur-reply, Maxfield renewed the motion to

strike Baldwin's supplemental affidavit, (Dkt. 49-1), and presented the Court with additional record evidence and further explanations in response to the new affidavits the University had submitted. Not only does the back and forth nature of the explanations to evidence already in the record leave the Court with the impression that the facts are genuinely in dispute, but the process employed by the parties is not consistent with Rule 56.

Nonetheless, the Court has reviewed Maxfield's objections to the Baldwin Affidavit. Maxfield moved to strike paragraphs 2(a), 2(c), 2(d), 2(e), 2(f), and 2(h) of the supplemental Baldwin Affidavit on the grounds that Baldwin lacked personal knowledge, rendered legal conclusions, or attempted to resolve a question of fact. The Court did not consider the facts, arguments, and conclusions set forth in the Supplemental Baldwin Affidavit[8] material for purposes of resolving the motion for summary judgment. Therefore, the evidentiary objection is denied.[9]

## 2.      Summary Judgment Standards

A key purpose of summary judgment is to "isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat

---

[8] The explanations in the Supplemental Baldwin Affidavit were an attempt to explain prior deposition testimony already in the record. The explanations serve only to highlight to the Court the disputed nature of the facts before it.
[9] The Court previously denied the Motion to Renew the Motion to Strike, but indicating it would consider the objections. The Court gave Defendant an opportunity to respond at the hearing. (*See* Dkt. 54, 52).

an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 256–57. The non-moving party must go beyond the pleadings and show "by [its] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324. The Court must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and the weight to be accorded particular evidence, and must view the facts in the light most favorable to the nonmoving party. *Kaelin v. Globe Communications Corp*., 162 F.3d 1036, 1039 (9th Cir. 1998).

The party bearing the burden of proof at trial "must establish beyond controversy every essential element of its ... claim." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) (adopting decision of district court "as our own"). A party who does not have the burden "may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact." Fed. R.

Civ. P. 56(c)(1)(B) (advisory committee's note). As a general rule, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal. Gas Co.*, 336 F.3d at 889).

3.    **Maxfield's Prima Facie Case Under the ADEA**[10]

The ADEA makes it unlawful for an employer to discharge or otherwise discriminate against an employee "because of ... age." 29 U.S.C. § 623(a). To prove discrimination because of age, Maxfield must introduce evidence from which a reasonable jury could conclude, in light of common experience, that it was more likely than not that the employer's adverse action was motivated by consideration of his age. *See Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579–80 (1978) (showing violation of Title VII of Civil Rights Act of 1964 requires "proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations"); *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ( "The factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff") (quotations omitted); *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) (plaintiff's burden under Title VII is to demonstrate that defendant's proffered explanation for an

---

[10] Neither the University nor Maxfield presented an argument about the claim for age discrimination under the Idaho Human Rights Act. At the hearing, both parties conceded that if the ADEA claim is dismissed, the age discrimination claim under state law should be dismissed as well.

adverse employment action is more likely than not a pretext for discrimination).[11]  When

evaluating age discrimination claims at the summary judgment stage, the courts employ

the familiar burden-shifting analysis developed in *McDonnel Douglas*. *See Pottenger v.*

*Potlatch Corp.*, 329 F.3d 740, 745 (9th Cir. 2003).

To maintain an age discrimination claim, Maxfield must produce enough evidence

to establish a prima facie case which, for purposes of summary judgment, means enough

evidence to permit a trier of fact to infer the fact at issue. *Rose v. Wells Fargo & Co.*, 902

F.2d 1417, 1420 (9th Cir. 1990). The elements of a prima facie case alleging

discriminatory termination are that Maxfield: (1) was at least forty years of age; (2) was

performing his job satisfactorily; (3) was discharged; and (4) was replaced by a

substantially younger employee with equal or inferior qualifications or discharged under

circumstances otherwise "giving rise to an inference of age discrimination." *Diaz v.*

*Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *Coleman v.*

*Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000)).[12] The last element of the prima

facie case is treated with "flexibility." *Diaz*, 521 F.3d at 1211 (citing *Nidds v. Schindler*

*Elevator Corp.*, 113 F.3d 912, 917 (9th Cir.1996)). "To support an inference of

discrimination an employee need not demonstrate that one particular individual was

---

[11] Congress designed the ADEA's discrimination prohibitions to parallel those found in Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 1. 42 U.S.C. § 2000e et seq. *See Lorillard v. Pons*, 434 U.S. 575, 584 (1978). As a result, principles of construction under Title VII are routinely applied in ADEA cases. *See Oscar Meyer Co. v. Evans*, 441 U.S. 750, 755–58 (1979) (noting that, where provisions of ADEA are virtually the same as Title VII, construction of ADEA in accordance with interpretations under Title VII serves Congressional intent). *See generally* 3A Larson, EMPLOYMENT DISCRIMINATION § 102.41 (1992).
[12] When a discharge occurs in the context of a general reduction in the employer's workforce, circumstantial evidence other than evidence concerning the identity of a replacement employee also may warrant an inference of discrimination. *Coleman*, 232 F.3d at 1281. This is because in a reduction-in-force case, no replacements are generally hired. *Diaz*, 521 F.3d at 1207 n2. Here, the Court will apply the modified test because Maxfield's discharge occurred in the context of a reorganization and consolidation of two University departments.

MEMORANDUM DECISION AND ORDER - 15

designated as his replacement; evidence that a group of younger and comparably or less-qualified employees assumed the plaintiff's responsibilities is sufficient." *Id.*

The elements of a prima facie case alleging failure to hire are similar. Maxfield's failure to hire claim is premised upon intentional discrimination. Maxfield must produce evidence that he (1) was a member within the protected class of individuals between forty and seventy years of age; (2) applied for a position for which he was qualified; (3) was rejected; and (4) the University filled the position with a younger person with similar qualifications. *Cotton v. City of Alameda*, 812 F.2d 1245, 1247 (9th Cir. 1987).

Maxfield was over forty years of age, and the University does not dispute that Maxfield was performing his job satisfactorily or that his employment was terminated as part of the reorganization of the two career placement offices. Nor does the University dispute that Maxfield applied for and was qualified for available positions, and that he was rejected. The two open positions for which Maxfield applied in July of 2011 were filled by younger individuals.

The first question is whether Maxfield was discharged under circumstances giving rise to an inference of age discrimination. Although the University had no obligation to transfer Maxfield to another position within the university when it decided to reduce its staffing, *Wells Fargo*, 902 F.2d at 1422, Maxfield has raised sufficient facts to establish an inference of age discrimination in connection with the reorganization. The University primarily rests its argument on the hiring of Karla LaOrange, age 54, who replaced Maxfield in the Teacher Education Department. But the real focus is the reorganization of two departments to form the ADC. Of all employees affected by the reorganization,

Maxfield was the only one not given a position in the ADC. Yet all of Maxfield's job duties continued, and a group of younger employees in the ADC performed the functions that Maxfield used to perform.

With the exception of Maxfield's responsibility for teacher placement, all of Maxfield's other responsibilities were assumed by younger employees in the ADC. These younger employees were placed in the ADC from other University departments. Not one of them was required to interview or apply for their positions in the ADC. The University attempts to distinguish Maxfield's circumstances from the circumstances of the other employees, describing Maxfield as a "true transfer" because his department was distinct from the two departments that "merged" to form the ADC. Baldwin describes the process as continuing the individual's employment, but in a new department. However, because Maxfield's job responsibilities, save one, were all subsumed by the ADC, the distinction is meaningless. Maxfield's responsibilities remained necessary, and ADC employees were performing them after the departments merged. The University offered no good reason why it would not wish to take advantage of Maxfield's years of experience by continuing his employment in the ADC, or why it chose to redistribute Maxfield's responsibilities instead of retaining a long-time employee. There is no dispute that Maxfield's responsibilities were redistributed among a group of younger employees earning less than Maxfield.

The second issue is the failure to re-hire. Again, the University focuses on the hiring of Karla LaOrange in the Field Services Office of the Teacher Education Department. But, at the time of Maxfield's termination from employment on June 6,

2011, four Career and Academic Counseling positions were open in the ADC. The University did not present evidence that Maxfield was unqualified for these four open positions. Yet, it chose not to transfer Maxfield into one of the four open positions in the ADC, despite the University's policy indicating a preference would be given to current employees desiring to transfer to different positions so long as they were suitably qualified. Maxfield was told also that there were no positions available for him despite these four open positions. Further, Maxfield was not given sufficient time to apply for the positions, as he was not given advance notice of his termination from employment. That left only two business days within which to apply for the positions. The four ADC positions were filled with younger employees ranging in age from 29 to 34. The trend continued into 2013, when three new full time hires under the age of 30 were hired for the ADC to perform career counseling duties, among others. The only other individuals working in the ADC over forty years of age were hired for part-time positions with no benefits.

When Maxfield did apply for an open position within the ADC, the University did not dispute that he was qualified for the position. Baldwin indicated all four applicants did well in the interview process. There is a disputed issue of fact regarding disqualifying statements Maxfield may or may not have made concerning Maxfield's discipline to perform detailed work. Both open positions for which Maxfield applied were filled by younger individuals.

All of these facts, taken together, raise triable issues of fact that Maxfield's discharge, and the failure to rehire, occurred under circumstances giving rise to an inference of age discrimination.

**4.      Legitimacy of the University's Explanation**

Moving to the next stage of the analysis, the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the employment decision. *Wells Fargo*, 902 F.2d. at 1420. To suffice under *McDonnell Douglas*, an employer's explanation must explain why the plaintiff "in particular" was laid off. *Diaz*, 521 F.3d at 1211 (citing *Davis v. Team Electric Co*., 520 F.3d 1080, ---- (9th Cir. 2008)). An explanation that Maxfield was discharged as part of a general reduction in force, without more, will not satisfy *McDonnell Douglas*. *Diaz*, 521 F.3d at 1212. *See Pottenger v. Potlatch Corp*., 329 F.3d 740, 746 (9th Cir.2003) (performance-related concerns satisfied stage two under the *McDonnell Douglas* framework).

Considering first the University's decision not to transfer Maxfield to the ADC, the University presented four reasons. The first two are based upon a perceived difficulty to "force" a transfer. However, upon creating the ADC, all employees were from other departments. In other words, Maxfield was the only employee from another department who was required to apply and interview, and was not allowed to simply transfer to the ADC even though all but one of his job responsibilities were consolidated in the ADC. Maxfield also was the only employee affected by the reorganization whose employment was terminated. Thus, the facts here are not similar to a reduction in force case, because the only "reduction" was Maxfield.

The University claims also that Maxfield did not work well with Hollingsworth, the new head of the ADC. But Maxfield had worked previously with Hollingsworth out of the same office for approximately six years, and the University presented no evidence that Maxfield and Hollingsworth were not able to work together. Maxfield describes his working relationship with Hollingsworth as "decent." And Baldwin is the only individual who claims Hollingsworth and Maxfield did not work well together. Conspicuously absent is an affidavit or deposition testimony from Hollingsworth himself. That absence raises the inference that the reason for not transferring Maxfield to the ADC is not entirely legitimate.

The second two reasons for not transferring Maxfield to the ADC are based upon Maxfield's allegedly expressed preferences to retain his same rank, salary and benefits, and to remain in the Field Services Office. However, Maxfield refutes making these statements. He indicates the only conversation he had about the ADC prior to his termination from employment was with Dean Cloward. No one on the reorganization committee spoke to him about the potential of transferring to the ADC, or otherwise informed him his employment was being terminated. Further, according to Maxfield, he indicated to Dean Cloward that he would go anywhere he would fit, and that no one asked him about a reduction in his salary. The University has not presented any indication that Maxfield was not performing his job duties satisfactorily.

Turning to the reasons for not re-hiring Maxfield for the two open positions within the ADC for which he applied and was qualified, the University proffers the explanation that Maxfield made disqualifying statements about his struggle to focus on detailed work.

Again, Maxfield presented his own version of the interview dialogue, and denies he made such statements. Further, after the interview, Baldwin wrote in an email that "all candidates" performed well in the interviews. Yet, Maxfield was not hired despite his many years of experience with the University.

There was some evidence that the University advocated for Maxfield to be hired as a full-time member of the faculty teaching Spanish. However, that position required a master's degree, which Maxfield does not dispute he lacked.

5.      **Pretext**

In the final stage of the analysis, if the University carries its burden of production, Maxfield must prove by a preponderance of all the evidence that the reasons offered by the University for his termination from employment were pretextual. *Diaz*, 521 F.3d at 1212. Maxfield may demonstrate pretext "either directly by persuading the court that a discriminatory reason likely motivated [the University] or indirectly by showing that [the University's] proffered explanation is unworthy of credence." *Diaz* 521 F.3d at 1212 (quoting *Snead v. Metro. Prop. & Cas. Ins. Co*., 237 F.3d 1080, 1093-94 (9th Cir. 2001)). Throughout the burden-shifting process, the plaintiff always carries the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. *Douglas v. Anderson*, 656 F.2d 528 (9th Cir. 1981) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981)).

Even assuming the University provided legitimate, non-discriminatory explanations for why Maxfield's employment was terminated, Maxfield argues the explanations for the termination of his employment and failure to re-hire lack credibility.

First, he contends that the University had a continuing need for Maxfield's expertise, and employees within the ADC took on and continued to perform all but one of his job duties after his discharge. Further, Maxfield pointed out there were four open positions within the ADC for which he was suitably qualified at the time of his termination. However, he was not given advance notice that his employment would be terminated and was given only two business days to submit an application for the positions. Finally, the fact that the University retained all other employees otherwise affected by the reorganization conflicts with its explanation that it was "difficult to force" a transfer. Although the University denies that it transferred employees, two separate departments were "merged" to form the ADC. It is a distinction without a difference—all other employees affected by the reorganization of their departments effectively "transferred" from these defunct departments to the ADC.

As for the disqualifying statements made in the later interviews, Maxfield again raises an inference of pretext. He was suitably qualified, and he denies making such statements. The employment policy handbook stating a preference for current employees also undermines the University's proffered explanation for not re-hiring Maxfield. Reasonable jurors could conclude that the University's proffered explanations—both for why it did not transfer Maxfield to the ADC and why it did not hire Maxfield for the open positions—undermine the credibility of the explanations for letting Maxfield go.

Maxfield has created genuine issues of fact regarding the legitimacy of the University's reasons for terminating his employment and not hiring him for other open positions, as well as issues of fact concerning pretext.

**6.      ERISA Claim**

Section 510 of ERISA (29 U.S.C. § 1140) protects an employee from being discharged from his employment to avoid payment of pension or welfare benefits. It states, in pertinent part, that:

> It shall be unlawful for any person to discharge, fire, suspend, expel, discipline or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ....

Section 510 protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 143 (1990). But, section 510 protects more than just vested rights. *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka, & Santa Fe R.R. Co.*, 510 U.S. 510 (1997). The section makes it unlawful for an employer to discharge a plan participant for the purpose of interfering with the "attainment of any right to which such participant may become entitled under the plan." *Inter-Modal*, 510 U.S. at 514. If a plaintiff can demonstrate that the motivation for his termination was his employer's attempt to avoid pension plan contributions, he or she states a claim under ERISA. *Felton v. Unisource Corp.*, 940 F.2d 503, 509-10 (9th Cir. 1991).

The University argues there is no evidence it terminated Maxfield's employment to prevent his pension benefits from vesting, or that it had any intent to interfere with Maxfield's attainment of his pension benefits. Maxfield does not dispute that his pension benefits were vested. Maxfield argues instead that, when the University terminated his

employment, the University interfered with his ability to continue to receive contributions to his retirement benefits from the University.

Maxfield does not allege that the denial of ERISA-covered benefits was a motivating factor in the University's decision to terminate his employment. Rather, Maxfield's argument is that the University's discriminatory conduct and its actions resulted in the loss of employment related opportunities and his ability to continue to receive regular contributions to his retirement plan had his employment continued. Maxfield's claim under ERISA for loss of future contributions is instead an element of his alleged damages under the ADEA, as there is no evidence that the denial of ERISA benefits was a motivating factor behind his termination.

Further, Maxfield does not allege that the ERISA plan is liable to pay benefits owed to Maxfield, nor does he allege that the true purpose of his termination from employment was to deprive him of pension rights. Rather, he alleges he lost future contributions which the University would have been required to pay had he continued his employment. Under these facts, Maxfield does not state a claim within the scope of ERISA. *See Ethridge v. Harbor House Restaurant*, 861 F.2d 1389, 1405 (9th Cir. 1988) ("[n]o ERISA cause of action lies ... when the loss of pension benefits was a mere consequence of, but not a motivating factor behind, the termination of benefits.").

# CONCLUSION

For the reasons discussed, the Court concludes there are disputed issues of material fact which preclude granting the University's motion for summary judgment on the ADEA claims. Maxfield presented evidence of satisfactory job performance for twenty-seven years, and an accumulation of circumstantial evidence that, taken together, could lead a reasonable juror to draw an inference of age discrimination. The University's explanation for Maxfield's discharge—that transfers can be difficult to force upon existing departments and Maxfield's desire to remain where he was—is suspect when taken in context with the reorganization and assimilation of employees from other departments into the ADC. Maxfield, the oldest employee, was the only employee adversely affected by the reorganization and who was not assimilated into the ADC. Yet his job responsibilities remained, and were performed by younger individuals assimilated into the ADC from other departments. Even if the University's explanations are considered facially legitimate, Maxfield created genuine issues as to the credibility of those explanations by refuting them with his version of events. These are issues of credibility the Court cannot resolve on summary judgment.

But Maxfield has not presented a prima facie case under ERISA. Rather, the loss of future contributions resulting from Maxfield's discharge is a component of Maxfield's alleged damages under the ADEA. He does not state a separate claim under ERISA, and summary judgment is appropriately granted to the University on the ERISA claim.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Defendant's Motion for Summary Judgment (Dkt. 16) is **GRANTED IN PART AND DENIED IN PART**.

2) The Court will conduct a telephonic scheduling conference with the parties for the purpose of setting pretrial deadlines and a trial date in this matter. A notice of hearing is forthcoming.

Dated: **June 19, 2014**

Honorable Candy W. Dale
United States Magistrate Judge